**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICHAEL R. CAHILL, TRUSTEE of THE HUNT IRREVOCABLE TRUST and of THE HUNT LEGACY TRUST, | § § § § | |
| *Plaintiffs/Counterclaim Defendants* | § § § | |
| v. | § § | Civil Action No. 21-679-WCB |
| AIR MEDICAL GROUP HOLDINGS, INC., | § § § | |
| *Defendant/Counterclaim Plaintiff.* | § § § | |

**MEMORANDUM OPINION AND ORDER**

This is a contract dispute arising out of the sale of a business. Michael R. Cahill, as Trustee of the Hunt Irrevocable Trust and the Hunt Legacy Trust, sued defendant Air Medical Group Holdings, Inc., ("Air Medical") to obtain the proceeds of a litigation settlement between Air Medical and a third party. The settlement resolved a lawsuit initiated by Valley Med Flight, Inc. ("VMF"), a company previously owned by the Hunt Legacy Trust and now owned by Air Medical.

I.    **Background**

In 2017, the Hunt Trusts, along with a non-party, the Fidelity Investments Charitable Gift Fund ("Fidelity"), sold their air ambulance service business to Air Medical for a total of [REDACTED]. The business comprised seventeen companies, variously owned by Fidelity and the two Hunt Trusts.[1] Among the assets that were transferred as part of the sale was a Pilatus turbo-prop airplane, referred to by its tail number as the "N5DM" aircraft.

---

[1] The contract for the sale of the business refers collectively to the seventeen companies that were sold to Air Medical as "the Companies." Dkt. No. 66-1, Exh. 1, at 1. The Hunt Legacy

In April 2016, prior to the sale of the business, the N5DM aircraft was parked at the Grand Forks Regional Airport in North Dakota when a mail cart owned by Integrated Airline Services, Inc., ("IAS") crashed into the aircraft and seriously damaged it.  Dkt. No. 9 ¶¶ 7–8.  Hunt opened a claim with its insurance carrier to recover the repair costs for the plane, which amounted to approximately $300,000.  *Id.* ¶¶ 8, 10.  Hunt paid for the repairs and returned the airplane to service.  *Id.* ¶ 10.

Hunt's insurance carrier offered to pay for the repairs to the airplane, but Hunt was concerned that if it made a claim on its own insurance policy, its premiums would go up.  *See* Dkt. No. 66-1, Exh. 7, at 23:15–24:5.  So instead, in November 2016 Hunt filed a negligence action against IAS.  In the lawsuit, Hunt sought at least $500,000, to include not only the cost of the repairs, but also incidental damages including the loss of the use of the airplane during the time when it was being repaired and was out of service.  Dkt. No. 9 ¶¶ 9–10.  IAS's insurance carrier made two offers to settle that lawsuit, first for $291,176.32 and later for $328,625.50, but Hunt rejected both offers.  *Id.* ¶ 11.

The negligence action was still pending when the sale of the business to Air Medical closed in 2017.  Pursuant to the agreement between Hunt and Air Medical ("the Purchase Agreement"), Air Medical obtained possession of the airplane, and it took over the litigation of the negligence action following the closing.  In 2020, the negligence action was settled for $600,000.  Dkt. No. 66-1, Exh. 13 § 1.  IAS's insurer paid that sum to VMF, which was now owned by defendant Air Medical.  Dkt. No. 9 ¶ 20.  In prosecuting the lawsuit, however, Air Medical incurred attorneys'

---

Trust owned thirteen of the Companies, the Hunt Trust owned three of the Companies, and Fidelity owned one.  *Id.* at Schedule A.  For simplicity, I will refer to the Hunt Trusts, Fidelity, and the companies that comprised their air ambulance service business collectively as "Hunt."

fees and costs of at least $715,807.59, leaving Air Medical with a net loss from the litigation of nearly $116,000.  Dkt. No. 25, Counterclaims ¶ 20.

Hunt filed this action against Air Medical, and the parties have now filed cross-motions for summary judgment.  Dkt. Nos. 63, 64.  In their motions, each side has claimed that it is entitled to judgment in its favor based on the terms of the Purchase Agreement.  Hunt argues that Air Medical should be required to pay the entire $600,000 that was paid to Air Medical in the settlement of the negligence action, without any reduction to account for the attorneys' fees and costs paid by Air Medical in that litigation.  Air Medical argues that Hunt is not entitled to any portion of the funds obtained in that litigation, even though Hunt paid $300,000 to repair the airplane.  On August 10, 2023, I held a hearing on the parties' cross-motions for summary judgment.

## II.   **Legal Standard**

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must draw all factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In the case of an issue on which the moving party bears the burden of proof at trial, the party seeking summary judgment must establish "the absence of a genuine factual issue," and if that party does not establish such an absence, "the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).  However, "[o]nce a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).

3

In the case of an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986).  The burden on the moving party in that situation can be satisfied "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up); *see also* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2727.1 (4th ed., April 2022 update).

## III.   <u>Discussion</u>

This case turns on the proper interpretation of certain clauses in the Purchase Agreement. *See* Dkt. No. 66-1, Exh. 1.  Before discussing the particulars of the contract, it is useful to outline some basic principles.

The Purchase Agreement provides that "all matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed" by Delaware law. Dkt. No. 66-1, Exh. 1, at 70 (section 11.13 of the Purchase Agreement).  Under Delaware law, a contract is generally construed as it "would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted).  That is, "[w]hen the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of the contract's terms and provisions." *Id.* at 1159–60.

4

However, "[w]hen contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry."  *In re Morrow Park Holding LLC*, No. 2017-0036, 2022 WL 3025780, at *17 (Del. Ch. Aug. 1, 2022), *as corrected* (Aug. 16, 2022) (quoting *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, No. 14348, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995)); *see also Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 848 (Del. 2019) ("The Term Agreement is therefore ambiguous on its face, and parol evidence must be considered to determine the parties' intent."); *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) ("When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity.").  If the extrinsic evidence does not reveal the parties' intent as to the ambiguity, Delaware courts apply a "last resort" rule of *contra proferentem* and construe the ambiguous contract provision against the party that drafted that provision.  *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 72 (Del. 2011).

Turning to the Purchase Agreement, the parties' primary dispute, as explained below, relates to the interpretation of the term "insurance proceeds" as that term is used in the contract. The parties also dispute whether there was a breach of the indemnification provisions of the Purchase Agreement.  Furthermore, each party has brought an unjust enrichment claim in the alternative to its contract claim.

### A.    *"Insurance Proceeds"*

I begin by discussing the proper construction of the term "insurance proceeds," as that term is used in the Purchase Agreement.  While several portions of the contract are relevant to that issue, the principal one is Exhibit E-1 to the contract, which is denominated "List of Retained

Properties."[2]  Dkt. No. 66-1, Exh. 2.  The "Retained Properties" listed in Exhibit E-1 are properties that were not transferred to Air Medical as part of the sale.  Exhibit E-1 listed a number of aircraft, mobile homes, and vehicles.  *Id.*  Section 6.06(a) of the contract stated that all items designated as "Retained Properties" were not to be transferred to Air Medical as a result of the sale; it also provided that any liabilities arising out of the Retained Properties would not be transferred to Air Medical as a result of the sale.  Dkt. No. 66-1, Exh. 1, at 36–37.  The N5DM aircraft is not among those assets listed in Exhibit E-1, the "List of Retained Properties."  Dkt. No. 66-1, Exh. 2.  It was therefore designated for transfer to Air Medical as part of the sale.  *See id.*

The key paragraph of Exhibit E-1 for purposes of this litigation, which is referred to as the "Second Miscellaneous Clause," reads as follows:

> To the extent not included in working capital, insurance proceeds related to the items listed in Schedule 4.13(b) of the Disclosure Schedule and insurance proceeds received by the Companies [i.e., Hunt] on or after the date of the Agreement for repair costs of Aircraft which have been paid by the Companies prior to the date of the Agreement.

Dkt. No. 66-1, Exh. 2, at 2.  The Second Miscellaneous Clause makes clear that insurance proceeds falling within that paragraph were not transferred as part of the sale.

Schedule 4.13(b) of the Purchase Agreement, which is referred to in the Second Miscellaneous Clause, reads as follows:

> The Company [i.e., Hunt] has outstanding insurance claims that have not yet been paid relating to the N5DM aircraft and 852MB helicopter.  The Company has paid to fully repair the N5DM aircraft, and that aircraft is now back in service.  The 852MB helicopter may require another $30,000 in repairs in order to restore it to full working condition but it will be repaired and in service prior to closing.

---

[2]  Although Exhibit E-1 is included in the version of the Purchase Agreement filed at Dkt. No. 66-1, Exh. 1, Air Medical has separately filed Exhibit E-1 as Dkt. No. 66-1, Exh. 2.  This order will cite that exhibit.

*Id.*, Exh. 4, at 2.  Schedule 4.13(a) contains a list of insurance policies held by Hunt, including a policy for fixed-wing aircraft.  *Id.* at 1.

The Purchase Agreement also identified ongoing litigation, including the negligence action against IAS.  *See* Dkt. No. 66-1, Exh. 1, at 19 (section 4.11 of Purchase Agreement); Dkt. No. 66-1, Exh. 5 (schedule 4.11, identifying the negligence action as one of the items of continuing litigation).  The pending lawsuits were not identified as Retained Property, and as a Hunt representative acknowledged in his deposition, the parties agreed that Air Medical would take over and manage those cases, including the negligence action involving the N5DM aircraft.  Dkt. No. 66-1, Exh. 11, at 46:10–21.

Taken together, those provisions of the contract established that the repaired airplane would be transferred to Air Medical as part of the sale, but that Hunt would be compensated for the costs Hunt incurred in repairing the aircraft by any "insurance proceeds" related to the aircraft, even if those proceeds were received after the execution of the Purchase Agreement.  The problem, however, is that the contract did not expressly define "insurance proceeds."  The principal issue in this case thus comes down to whether the term "insurance proceeds" includes the payment made to settle the negligence action when the payment was funded by IAS's insurance carrier.

Hunt argues that the reference to the "insurance proceeds received by the Companies . . . for repair costs of Aircraft" in the Second Miscellaneous Clause includes the funds received in the settlement of the negligence action.  Their position is that the term "insurance proceeds" refers to any funds that were paid by an insurance company for the damages to the aircraft, including a payment from Hunt's insurer, or a payment from an insurer for a third party, such as a payment made pursuant to a judgment or in settlement of a lawsuit.  Moreover, Hunt argues that it is entitled to all the proceeds paid by IAS's insurance carrier to settle the negligence

7

action (i.e., the entire $600,000 settlement payment), not just the amount necessary to compensate Hunt for the cost of repairing the airplane (i.e., $300,000).

Air Medical, on the other hand, argues that even though the funds that were used to settle the negligence action against IAS were paid by IAS's insurance carrier, they were not "insurance proceeds," as that term was used in the Second Miscellaneous Clause. The reference to "insurance proceeds" in the critical paragraph in Exhibit E-1, Air Medical contends, relates to insurance proceeds resulting from claims that Hunt submitted to its own insurer, not from payments made by insurers of third parties in satisfaction of judgments or settlements of litigation against those third parties.

Air Medical argues that the reference in schedule 4.13(b) to the "outstanding insurance claims" on the N5DM aircraft indicates that the term "insurance proceeds" is limited to claims against Hunt's own insurer. That is, in Air Medical's view, "insurance proceeds" would not include a payment by a third party's insurer, even if the payment was made on a claim without any lawsuit being filed.

Neither party's reading of the Purchase Agreement is implausible on its face. I therefore find that the Purchase Agreement is facially ambiguous as to whether the settlement payment would be considered "insurance proceeds."

There are problems with both parties' positions, however. The parties clearly anticipated that Hunt would be entitled to be reimbursed for the repair costs for the airplane from an insurance payment, whether made before or after the sale. Nothing in the contract suggests that the term "insurance proceeds" is limited to payments from Hunt's insurance carrier, as opposed to payments from IAS's carrier, at least if that payment were made absent litigation. Furthermore, the evidence presented to the court indicates that the parties expected that the negligence action would be settled

8

promptly, either before the closing of the sale or shortly thereafter.  It seems anomalous to say that if the negligence action had been settled the day before the closing of the sale, the funds would have gone to Hunt, not to Air Medical, but that if the settlement occurred the day after the closing, the funds would all go to Air Medical.  There is no clear indication in the sales contract that the date of the sale would have such a dramatic effect on the parties' positions regarding the proceeds of the settlement.  In fact, the characterization in the Second Miscellaneous Clause of insurance proceeds received after the date of the Purchase Agreement being Retained Property suggests that the parties wanted to ensure that the timing of the receipt of compensation for the damage to the airplane would not determine which party was entitled to that compensation.

On the other hand, as Air Medical points out, the regime posited by Hunt would lead to the peculiar result that Air Medical would be charged with the task of continuing the litigation after the sale with no hope of obtaining any benefit from it, as the proceeds of the litigation would all go to Hunt no matter how much Air Medical invested to obtain a settlement or judgment on the claim.  Air Medical explains that under Hunt's position it would have been in Air Medical's interest to promptly settle the lawsuit for one dollar, thus minimizing the expenses of a litigation that offered Air Medical no prospect of any return, a result that would have been of no net benefit to either of the parties.

Because the term "insurance proceeds" is ambiguous, I must look to extrinsic evidence to determine the parties' intent in using that term.  *See Morrow Park*, 2022 WL 3025780, at *17. Yet, other than to point out the anomalies resulting from each other's positions, neither party has

offered conclusive evidence as to what the parties intended by their use of the term "insurance proceeds" in Exhibit E-1 of the Purchase Agreement.[3]

Each party points to deposition testimony to support its interpretation of the term "insurance proceeds," but the deposition testimony is conflicting and does not resolve the ambiguity in the term. Hunt points to the testimony of Hunt executive Joseph Hunt, who said that in discussions with Air Medical executive Fred Buttrell prior to the closing of the sale, they agreed that if the negligence lawsuit continued after the sale, the proceeds of the lawsuit would go to Hunt. *See* Dkt. No. 83, Exh. A, at 32:11–36:1. In particular, Mr. Hunt testified that Mr. Buttrell said "[w]e [Air Medical] will continue the lawsuit, and the . . . proceeds will go to you [Hunt]." *Id.* at 34:20–23.[4]

In his deposition, Mr. Buttrell denied having made such an agreement. He testified that because Hunt had paid for the repairs to the aircraft, "they should claim through their insurance. Their insurance would pay. . . . And I was perfectly fine with that money" going to Hunt. *Id.*, Exh. B, at 42:6–44:11. However, Mr. Buttrell vehemently denied having agreed that Air Medical

---

[3] In support of its contention that the term "insurance proceeds" does not include the proceeds of the settlement that were paid by IAS's insurance carrier, Air Medical relies on the Third Circuit's decision in *Kollar v. Miller*, 176 F.3d 175 (3d Cir. 1999). In that case, the debtor in a bankruptcy dispute sought to exempt the anticipated proceeds of a tort action from the bankruptcy estate based on a Pennsylvania statute that exempted "insurance proceeds," including "[t]he net amount payable under any accident or disability insurance." *Id.* at 179. The court held that the statutory exemption was intended to cover "items that are paid directly to a debtor as a result of his or her own insurance coverage," and not the proceeds of tort litigation even "if such proceeds happened to be paid by the defendant's insurance carrier." *Id.* The Third Circuit's interpretation of the applicable Pennsylvania statute provides little guidance as to the proper construction of the term "insurance proceeds" in the Purchase Agreement, a term that is not tied to any Delaware statutory provision, much less any provision of Pennsylvania law.

[4] In his deposition, Hunt representative Benjamin Dorman provided support for Mr. Hunt's testimony by stating that paragraph 14 of the complaint, which alleged that Hunt informed Air Medical that Hunt wished to retain the proceeds of the negligence litigation, was accurate. Dkt. No. 83, Exh. D at 35:1–11.

would continue the lawsuit but that the proceeds of the lawsuit would go to Hunt. *Id.* at 53:8–54:10 ("I don't ever recall saying that I'm going to carry the water on a lawsuit after closing on this asset. Why the—excuse my language, why in the hell would I do that?").  In addition, Mr. Hunt sent an email to Mr. Buttrell shortly before the Purchase Agreement was finalized, addressing the question of how to dispose of the proceeds of pending lawsuits that settled after the closing and in which Hunt had paid significant attorney's fees.  He suggested "a percentage split [of the proceeds] based on the dollar amount spent on attorneys fees."  Dkt. No. 88-1, Exh. 15, at 2–3.  Air Medical did not agree to that arrangement. *See id.*, Exh. 16, at 60:1–24.  That evidence is a further indication that there is an unresolved dispute of fact as to the proper interpretation of the parties' agreement as applied to the settlement funds from the negligence litigation.

In sum, the testimonial evidence proffered by the parties does not establish that the parties had a clear understanding of whether the proceeds of a settlement reached after the closing would go to Hunt or to Air Medical, and in particular whether the term "insurance proceeds" included payments made by a third-party insurance carrier to settle the negligence lawsuit.

Because that term is critical to the resolution of the dispute, I find the issue of the parties' intent is a factual question unsuitable for resolution on summary judgment.  At trial, the parties will have the opportunity to present extrinsic evidence shedding light on the meaning of the term, and thus on how the dispute should be resolved.  Moreover, the parties will have the opportunity to present evidence regarding which party drafted the critical language in Exhibit E-1, as the doctrine of *contra proferentem* may apply if the parties' intent remains unclear in light of the extrinsic evidence. *See ConAgra*, 21 A.3d at 72.[5]

---

[5]  Air Medical acknowledges that its counsel drafted the portion of Schedule 4.13(b) that relates to the "insurance claims" relating to the N5DM aircraft and the 852MB helicopter, *see* Dkt.

There is, however, one subsidiary issue that can be decided without the need for a trial, and which may make any trial simpler.  Although Hunt has sought judgment for the full $600,000 amount of the settlement payment, it is clearly not entitled to more than $300,000, even if it is correct that the term "insurance proceeds" includes funds paid by an insurance company in settlement of a lawsuit against a third party.  That is because the Second Miscellaneous Clause makes clear that the compensation to be paid to Hunt is directed to reimbursing it for the costs they incurred for the repairs to the airplane, which was approximately $300,000.  As noted, the Second Miscellaneous Clause defines "Retained Property" to include, *inter alia*, the following items:

> To the extent not included in working capital, insurance proceeds related to the items listed in Schedule 4.13(b) of the Disclosure Schedule and insurance proceeds received by the Companies on or after the date of the Agreement for repair costs of Aircraft which have been paid by the Companies prior to the date of the Agreement.

Dkt. No 66-1, Exh. 2, at 2.  Hunt acknowledges that only $300,000 of its demand in the negligence litigation was for the repair costs to the airplane, and that the remainder of the sum sought in the negligence litigation was for incidental damages such as the loss of the use of the airplane while it was being repaired.  *See* Dkt. No. 9 ¶¶ 9–10, 31.  Any judgment in favor of Hunt in this case will thus be limited to the repair costs (plus any applicable interest).[6]

---

No. 65 at 6, but the parties do not point to any record evidence as to which party drafted the Second Miscellaneous Clause in Exhibit E-1.

[6] At the hearing on the cross-motions for summary judgment, counsel for Hunt argued that the first portion of the Second Miscellaneous Clause, which refers to "insurance proceeds related to the items listed in Schedule 4.13(b) of the Disclosure Schedule," covers the $600,000 settlement payment.  That argument is wholly meritless.  Schedule 4.13(b) states, in pertinent part, that "The Company has outstanding insurance claims that have not yet been paid relating to the N5DM aircraft and 852MB helicopter."  Dkt. No. 66-1, Exh. 1, at 55.  Even if the term "insurance proceeds" in the Second Miscellaneous Clause can be read to include the settlement payment funded by IAS's insurer, the reference to "insurance claims" in Schedule 4.13(b) plainly refers only to "insurance claims" against Hunt's own insurer.  Hunt did not at that time have, and in fact never had, a "claim" against IAS's insurer, and clearly did not have any "outstanding insurance claims" against that insurer.

### B.   *Indemnification for the N5DM Litigation Expenses*

In addition to the dispute over the meaning of the term "insurance proceeds," each party contends that the other party failed to comply with contractual obligations related to the litigation and settlement, and that as a result each is entitled to summary judgment under the contract.

For its part, Air Medical has counterclaimed for breach of contract, arguing that if the settlement proceeds are regarded as Retained Property under the Purchase Agreement, the approximately $716,000 that Air Medical spent on attorneys' fees and costs to litigate the negligence action prior to the settlement of the action should be characterized as a Retained Liability under the contract, and thus should be collectable against Hunt.

Hunt responds that Air Medical is not entitled to collect that sum, for several reasons.  First, Hunt argues that it did not agree to indemnify Air Medical for any out-of-pocket expenses or other losses related to the negligence lawsuit.  That argument, however, is contrary to the plain language of the Purchase Agreement.

Section 6.06 of the Agreement defines "Retained Liabilities" as "all Liabilities (whether arising prior to, on or after the Closing) arising out of the Retained Property."  Dkt. No. 66-1, Exh. 1, at 37.  Air Medical argues that if the settlement payment is determined to be "insurance proceeds," which are a form of Retained Property under the Second Miscellaneous Clause, then Air Medical's expenses from litigating the negligence action to obtain those proceeds are liabilities that "aris[e] out of the Retained Property."  *See id.*  Moreover, section 9.02 of the Purchase Agreement provides that Hunt must indemnify Air Medical for "any actual losses, out-of-pocket costs or expenses, Liabilities, or other damages . . . which [Air Medical] suffer[s] or incur[s] arising out of or as a result of . . . any Retained Property or Retained Liability."  *Id.* at 50.  If the settlement funds are determined to be "insurance proceeds," then the costs of litigating the

13

underlying negligence action would qualify as costs for which Air Medical would be entitled to be indemnified.

In the alternative, Hunt argues that even if the indemnification clause of the Purchase Agreement would cover Air Medical's litigation expenses, Hunt did not breach the indemnification clause, for two reasons. First, Hunt argues that Air Medical failed to follow the notification and consent provisions set forth in Section 9.06 of the Purchase Agreement. Second, Hunt argues that any indemnification claim is time-barred under the terms of the Purchase Agreement.

As to the first point, Section 9.06 of the Purchase Agreement requires a party seeking indemnification to "notify the indemnifying party (an 'Indemnitor') of the claim in writing promptly after receiving notice of any actual or potential Action, demand or other claim against the Indemnitee (if by a third-party, a 'Third Party Claim')." Dkt. No. 66-1, Exh. 1, at 52. That language, Air Medical argues, applies only to "the defense of third-party claims." Dkt. No. 87 at 9. I disagree that the language of section 9.06 is limited to the defense of third-party claims; the parenthetical specifying that claims are "Third Party Claims" if made "by a third-party" clearly indicates that section 9.06 is intended to cover more than just third-party claims. Dkt. No. 66-1, Exh. 1, at 52. In any event, the indemnification Air Medical would be seeking would be primarily for the services provided by Air Medical's counsel in the N5DM litigation, which could be described as a "demand or other claim" by a third party against Air Medical. *See id.* It is undisputed that Air Medical never notified Hunt of any such demand.

Although litigation expenses appear to fall within the scope of section 9.06, Air Medical's delay in notifying Hunt of its indemnification claim is not necessarily fatal to that claim. Section 9.06 expressly provides that "the failure to . . . notify any Indemnitor shall not relieve the Indemnitor of its obligations hereunder except to the extent that such failure actually and materially

prejudices the Indemnitor." *Id.* at 53.  Neither party has offered any evidence on the issue of prejudice, so the question whether Hunt was prejudiced by Air Medical's failure to provide notification of its claim is not suitable for resolution at this stage of the litigation.

As for the second point, Hunt argues that any indemnification claim by Air Medical would be time-barred.  In support of that contention, Hunt points to section 9.08 of the Purchase Agreement, which unequivocally provides that "no claim for indemnification hereunder may be made after the expiration of [the] Survival Date," which is defined in section 9.01 as being the 18-month anniversary of the closing date for the Purchase Agreement.[7]  *Id.* at 49, 54.  A designee for Air Medical testified in a Rule 30(b)(6) deposition that to his knowledge Air Medical never made an indemnification claim for the expenses incurred in litigating the N5DM action.  Dkt. No. 83-4, Exh. F, at 39:24–40:4.  And Air Medical has provided no evidence to the contrary.[8]  For that reason, the argument that Hunt was required to indemnify Air Medical fails because any such claim for indemnification would be time-barred.

_____

[7]  Relatedly, the Purchase Agreement specified that within three business days of the 18-month anniversary of the closing, the parties were to empty the escrow account holding the funds reserved for indemnification claims and disburse the remaining balance to the parties.  Dkt. No. 66-1, Exh. 1, at 52.

[8]  Air Medical's only argument in response to Hunt's position regarding the 18-month time bar is that Hunt "took the exact opposite position at the motion to dismiss stage."  Dkt. No. 87 at 9.  In moving to dismiss Hunt's complaint, Air Medical argued that Hunt's claims were time-barred because "[t]he survival clause in Section 9.01 unambiguously provides that claims for breach of the pre-closing covenants in the agreement shall survive for 18-months from the closing date."  Dkt. No. 11 at 15.  In response, Hunt argued that the survival clause did not apply because their claims did not arise under the section of the Purchase Agreement governing pre-closing covenants.  Dkt. No. 14 at 15.  Neither party referred to Section 9.08 of the Purchase Agreement, which separately provides that claims for indemnification must be made prior to the expiration of the Survival Date.  Accordingly, the parties' arguments on the motion to dismiss do not affect the analysis of the time bar under section 9.08 of the Purchase Agreement.

In sum, Hunt is entitled to summary judgment on Air Medical's breach of contract counterclaim because Air Medical failed to make a timely request for indemnification under the Purchase Agreement.

### C.   Unjust Enrichment

Finally, each party contends that it is entitled to relief on a theory of unjust enrichment. Air Medical asserts that requiring it to pay over the $600,000 settlement proceeds while having to bear the costs of litigating the negligence action would result in unjustly enriching Hunt. And Hunt argues, under an unjust enrichment theory, that it is entitled to recover the uncompensated losses it suffered for having to repair the airplane and for the disruption of their business while the plane was being repaired.

Each party presses its claim for unjust enrichment as an alternative ground for recovery in the event its breach of contract claim fails. Dkt. No. 81 at 12; Dkt. No. 82 at 20. Under Delaware law, however, it is well settled that an unjust enrichment claim cannot stand when there is "an express, enforceable contract that controls the parties' relationship." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (quoting *Bakerman v. Sidney Frank Importing Co.*, No. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006)); *Air Prods. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 216 (D. Del. 2017) ("Delaware courts have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract." (cleaned up)).

To be sure, an unjust enrichment claim can stand in the alternative when there is a claim that the parties' contract is void or unenforceable. *Novipax Holdings LLC v. Sealed Air Corp.*, No. 17C031682, 2017 WL 5713307, at *15 (Del. Super. Ct. Nov. 28, 2017) ("A claim for unjust enrichment may . . . proceed under the theory that no valid contract exists."). But no party in this

16

case is contending that the Purchase Agreement is unenforceable or that it does not govern the parties' relationship; the parties simply disagree about the proper construction of the Agreement. *See Moon Express, Inc. v. Intuitive Machines, LLC*, No. 16-344, 2017 WL 4217335, at *9 (D. Del. Sept. 22, 2017), *report and recommendation adopted*, 2017 WL 11554232 (D. Del. Oct. 30, 2017) (recommending dismissal of unjust enrichment claim where "neither party appear[ed] to dispute the existence or enforceability" of the contract and the pleaded facts "clearly relate[d] to a 'relationship between the parties that [was] governed" by the contract).

Accordingly, both parties are entitled to summary judgment dismissing the unjust enrichment counterclaims because those claims are duplicative of the parties' breach of contract claims.

## IV.   <u>Conclusion</u>

In summary, Air Medical's motion for summary judgment, Dkt. No. 64, is GRANTED with respect to Hunt's unjust enrichment claim and DENIED in all other respects.  Hunt's motion for summary judgment, Dkt. No. 63, is GRANTED with respect to Air Medical's counterclaims for breach of contract and unjust enrichment, and DENIED in all other respects.

* * * * *

I note that many of the materials filed in support of both parties' motions for summary judgment have been filed under seal and that the public versions of those materials contain numerous redactions.  Accordingly, in an abundance of caution, this order has been filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal, and if so which

portions.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.[9]

IT IS SO ORDERED.

SIGNED this 15th day of August, 2023.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

---

[9] I have reviewed the redactions made by the parties in their submissions relating to the summary judgment motions, and those redactions appear to be excessive.  For example, the parties have redacted all references to the $600,000 payment in settlement of the negligence litigation, which seems difficult to justify.  I will not require the parties to revise the redacted versions of their filings.  However, any proposed redactions to this order, such as to the amount of the settlement agreement, will have to meet a heavy burden of necessity.  Conclusory statements, such as a general assertion that the disclosure of particular information will be injurious to a party's business interests or that the parties previously agreed among themselves or with third parties to keep certain information confidential, will not suffice.

18